IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BARBARA RABER, | ) | CASE NO. 5:12-cv-00862 |
| | ) | |
| Petitioner, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| GININE TRIM, Warden, | ) | KATHLEEN B. BURKE |
| | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

Petitioner Barbara Raber ("Petitioner" or "Raber") filed this habeas corpus action *pro se* pursuant to 28 U.S.C. § 2254 on April 10, 2012, asserting two grounds for relief which are set forth below in Section II.E.[1]  Doc. 1, Doc. 6.    Respondent filed a Return of Writ (Doc. 9) and Raber filed her Traverse (Doc. 10).

Raber challenges the constitutionality of her conviction and sentence for aggravated murder with a firearm specification in *State of Ohio v. Barbara Raber*, Case No. 09-CR-0224 (Wayne County).  Doc. 1.  The trial court sentenced Raber to 20 years to life for the aggravated murder and 3 years for the gun specification.  Doc. 9-7, pp. 56-57.[2]

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned concludes that Raber's grounds for relief are procedurally defaulted.  Accordingly, Raber's

---

[1] Pursuant to this Court's December 20, 2012, Order (Doc. 4), on January 18, 2013, Raber filed a Supplemental Amendment regarding her claims that appellate counsel was ineffective (Doc. 6).

[2] Page number references refer to the page number for the cited ECF Doc.

Petition for writ of habeas corpus should be **DENIED**.  Raber's request for an evidentiary hearing contained in her Traverse (Doc. 10) is **DENIED** as moot.

## I.        Factual Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct.  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008) *cert. denied,* 129 S. Ct. 2878 (2009).  The Ohio Ninth District Court of Appeals summarized the facts underlying Raber's  conviction as follows:

> [**P2] On the morning of June 2, 2009, a neighbor discovered Barbara Weaver lying on her bed with a gunshot wound to her chest. The neighbor went to check on Weaver after one of Weaver's young children came to her and told her that he had found his mother dead in her bed. Medical assistance arrived shortly thereafter, and the Wayne County Coroner pronounced Weaver deceased later that morning. The Coroner estimated that Weaver died sometime between midnight and six o'clock in the morning on June 2, 2009. It was later determined that Weaver died from a single gunshot wound fired at close range from a .410 gauge shotgun.

> [**P3] Eli Weaver, Barbara Weaver's husband and the father of their five children, received a phone call about his wife while on a fishing trip to Lake Erie. Eli had left the Weaver home at approximately 3:00 a.m. that morning. Eli spoke with police when he returned home and initially denied any involvement in his wife's death. He later admitted, however, that he and his girlfriend, Raber, had planned Barbara Weaver's murder and Raber committed the murder with his assistance.

> [**P4] Eli and Raber began a personal relationship several years earlier, after the two met through Raber's husband. Eli and his family were members of the Amish community when he and Raber began their relationship, but Eli twice left the community after being shunned for his behavior. Eli had several affairs and met women online through the use of a cellular phone that he received from Raber. When the two began discussing the murder of Barbara Weaver, they sent numerous text messages to each other setting out their plan. Police obtained the text messages during their investigation.

[**P5] On June 10, 2009, officers from the Wayne County sheriff's office came to Raber's home to arrest her for Weaver's murder. After officers arrested Raber, they drove her to the sheriff's office and interrogated her. Raber confessed to Weaver's murder during the interrogation, but refused to complete a written statement. Raber spent the night in jail, and officers questioned her again the next day about several details of her confession. Raber eventually asserted her right to counsel and ended the interrogation.

\* \* \*

{¶ 34} Eli Weaver testified against Raber at her trial as a result of his plea agreement with the state. Eli admitted that he had multiple affairs during his marriage and "just didn't love [his] wife the way [he] should have loved her." He left his Amish faith and home more than once because he wanted "more freedom" but was welcomed back each time. Eli recalled that he began a relationship with Raber about six years before his wife's murder. According to Eli, once he mentioned wanting to be rid of his wife to Raber, Raber "ran with [the idea]" and repeatedly suggested poisoning Weaver. Eli testified that he considered ingesting poison along with his wife so as to commit suicide. He accepted "poison pills" from Raber about two to three weeks before Barbara Weaver's actual death but did not go through with the poisoning. Raber also suggested that Weaver be suffocated or murdered with a firearm.

{¶ 35} Eli testified to the content of the text messages that he and Raber exchanged about Barbara Weaver's murder. Eli planned on going on a fishing trip to Lake Erie with several of his friends on June 2, 2009. When he told Raber of his planned trip, she sent him a text message asking him what time he was leaving and stating that June 2 "would be a good day to do it" because Eli would not be at home. Eli responded by text that he would leave his basement door open when he left. The next day, June 2, 2009, Eli left his home for his fishing trip shortly after 3:00 a.m. He testified that he left the bottom basement door unlocked and sent Raber a text message on the way to Lake Erie. Raber sent Eli several text messages expressing her concern that she would not be able to follow through. Specifically, at 3:03 a.m., Raber asked Eli how she was supposed to see in the dark and commented that "[i]t's too scary." Eli responded by text message at 3:20 a.m., telling Raber to take a light. Eli received additional text messages at 3:25 a.m. and 3:26 a.m. from Raber, who told him that she was "so scared" and asked where he was. Eli responded that he was in Wooster and advised Raber not to leave anything behind. Raber sent another text message at 3:29 a.m. asking if she could "drive in behind the pines."

{¶ 36} Eli testified that he received a phone call at about 6:00 a.m. from Firman Yoder, a neighbor who lived behind the Weavers' home. Yoder indicated that Barbara Weaver was "not responding," and Eli left for home. Eli met with Detective Chuhi when he got back to town and gave a statement. Eli denied any involvement in his wife's death but mentioned that he was having a sexual

relationship with Raber. After speaking with Detective Chuhi, Eli remained at home the rest of the day. He testified that he received a text message from Raber at 2:46 p.m. that said, "[W]hatever you do don't give your cell phone, please." He later received another text message from Raber, asking if they could change phone numbers so that their phones could not be traced. Raber, who had given Eli his cell phone as a part of her phone plan, later changed Eli's cell phone number.

{¶ 37} Eli testified that Raber came to his barn about one week later and the two discussed his wife's murder. Raber told Eli that she was "sorry for everything" and explained how she had gone into his house and Eli's bedroom. Additionally, she asked Eli about how to clean a gun so that it might appear that the gun had not been used. She also asked Eli what to say if her husband noticed that their .410–gauge shotgun was missing.

{¶ 38} Linda and Firman Yoder testified that they lived behind the Weavers' home in a house that was attached to a gun shop that Eli owned and operated. Outside of the shop, a small shanty contained a phone equipped with voicemail. Linda Yoder testified that she checked the voicemails on the shanty's phone on June 3, 2009. One voicemail, from an unidentified male, stated, "Eli, you can run but you can't hide. Obviously we got the wrong person last night." Police later identified the male caller as David Weaver, a friend of Raber's family. David Weaver testified at trial that Raber called him shortly after Barbara Weaver's murder and asked him to leave the message on the shanty's phone. He also testified that he loaned Raber his .410–gauge shotgun four to five years before Barbara Weaver's murder, but Raber never returned it.

{¶ 39} Dr. Amy Joliff, the Wayne County coroner, testified that she arrived at Barbara Weaver's home at about 11:30 a.m. on June 2, 2009. She observed a single gunshot wound to Weaver's chest but did not observe any stippling. Dr. Joliff testified that stippling would indicate that the gunshot was discharged from a further distance and that a lack of stippling would be consistent with a gunshot wound received at close range. Dr. Joliff recorded Weaver's time of death as 2:00 a.m. on Weaver's death certificate but stated that Weaver died anywhere from 12:00 a.m. to 6:00 a.m. She explained that time-of-death estimations are inexact and that she only recorded Weaver's time of death as 2:00 a.m. because death certificates require the recording of a specific time.

{¶ 40} Dr. Lisa Kohler, the Summit County chief medical examiner, performed the autopsy on Barbara Weaver's body. She concluded that Weaver died as the result of a single gunshot wound to the right side of her chest. Dr. Kohler found shotgun pellets inside Weaver's body, but not any type of wadding, cork, or shot cup. She explained that when a person is shot from a very close distance with a shotgun, the latter items are generally found in the person's body along with the shotgun pellets. Dr. Kohler opined, however, that it would be possible to fire a shotgun at close range and leave only pellets behind if the shot passed though another substance before entering the body. She opined that such a wound might

4

occur if a shotgun was fired through a bedspread or comforter. Dr. Kohler agreed with Dr. Joliff's assertion that arriving at a time of death is "not an exact science."

{¶ 41} John Gardner, a firearms examiner for the Ohio Bureau of Criminal Identification and Investigation, testified that he examined the shotgun pellets extracted from Barbara Weaver's body as well as her bedspread. He testified that he determined that the pellets were "[n]umber six shot," a common type of shot used in at least four different gauges of shotguns. Gardner also testified, however, that Weaver's bedspread contained two holes that he was able to measure and use to determine the size of the projectiles that passed through it. Gardner concluded, based on the measurements he made, that either a .410–gauge or .410–bore shotgun was used to kill Barbara Weaver.

{¶ 42} Detective Maxwell of the Wayne County Sheriff's Office testified that he went with Detective Chuhi to arrest Raber on June 10, 2009, and also searched the Weavers' home as part of the investigation. Detective Maxwell testified that police found money on the kitchen counter at the Weaver home, which he indicated would be unlikely if a robbery had occurred. He also indicated that the police collected two .410–gauge shotguns from Eli's gun shop as well as a box of .410 slugs with one slug missing. Detective Maxwell testified that when he and Detective Chuhi interviewed Raber, she admitted to sending texts to Eli but claimed that she only meant them as a joke and wanted to see how far he would let the joke go. Later during the same interview, however, Raber began crying and informed the detectives that "it was an accident." She described to the detectives how she drove to Barbara Weaver's home on the morning of June 2, 2009, and went through the unlocked bottom door. Raber claimed that she only went there to scare Weaver, but "the gun went off" when she was standing in the bedroom doorway. She could not remember what type of gun she had with her, but she told the detectives that she had placed the gun in her husband's gun cabinet when she got back home. Raber insisted that "it was all Eli's idea" and that he repeatedly begged her to kill his wife. Detective Maxwell testified that he and Detective Chuhi went to speak with Raber again the next day because they did not believe she was being entirely truthful and several of her statements did not match the facts the police had uncovered. For example, the police did not find a .410–gauge shotgun in the Raber home and knew, based on the type of wound Barbara Weaver had received, that Raber would not have been able to accidentally shoot her from a distance. When the detectives began to ask Raber about the details of her oral statement, however, she asserted her right to counsel and ended the interview. Detective Maxwell testified that he believed that Raber was trying to minimize her involvement by misconstruing the facts to make the shooting sound accidental.

{¶ 43} Detective Chuhi testified that he initially met Raber on June 3, 2009, as a result of Eli's statement that he and Raber were having an affair. Raber denied having any information about Barbara Weaver's murder when Detective Chuhi first spoke with her, and she gave a written statement to that effect. Only after the

detectives had arrested Raber and began discussing the text messages she had exchanged with Eli did she admit to murdering Weaver. Detective Chuhi confirmed Detective Maxwell's testimony that Raber said the murder was Eli's idea and that it was an accident.

{¶ 44} Dena Unangst, Raber's cellmate at the Wayne County Jail, also testified against her. Unangst testified that Raber told her she had purchased a .410–gauge shotgun and made several statements about Eli, indicating that he wanted to kill his wife. Unangst further testified that Raber asked her how long fingerprints would remain on a gun.

{¶ 45} Several other pieces of evidence also emerged at trial. In addition to the .410–gauge shotgun that Raber had borrowed from David Weaver, Larry Miller testified that Raber purchased a .410–gauge shotgun from his gun supply store on November 15, 2008. Accordingly, Raber had access to two different .410–gauge shotguns, the type of weapon used to kill Barbara Weaver. Officers also found a notebook from Raber's home with several types of poisons written down inside it. Finally, Raber had several discussions with her husband over the jail phone during her stay in the Wayne County Jail. Raber admitted to her husband that she had sent text messages to Eli about "that stuff" but insisted that her text messages were just meant to lead on Eli and see how far he would go.

Doc. 9-2, pp. 3-7, 11-13.  *See also State of Ohio v. Raber*, 189 Ohio App. 3d 396, 400-40, 413-417 (Ohio Ct. App. Aug. 30, 2010).

## II.    Procedural Background

### A.    State Conviction

In June 2009, the Wayne County Grand Jury indicted Raber for aggravated murder, a violation of Ohio Rev. Code § 2903.01, with a firearm specification.  Doc.  9-2, pp. 17, 30.  Raber pled not guilty.  Doc. 9-2, p. 30.  On August 21, 2009, Raber filed a motion to suppress, wherein she sought to exclude oral statements she made to the police upon and after her arrest.  Doc. 9-2, p. 25.  On September 14, 2009, the trial court held a hearing on Raber's motion to suppress.[3]  Doc. 9-2, pp.  42-75.  On September 17, 2009, the trial court overruled Raber's motion to suppress.  Doc. 9-2, p. 22.  The case proceeded to a jury trial on September 17, 2009.

---

[3] The trial court also heard Raber's motion for an interpreter on September 14, 2009.  Doc. 9-2, pp. 37-42.  The trial court took that motion under advisement.  Doc. 9-2, p. 42.

Doc. 9-3, p. 4.  On September 22, 2009, the jury returned a verdict of guilty of aggravated murder with a further finding that Raber had used a firearm in the commission of the offense of aggravated murder.  Doc. 9-2, p. 22, Doc. 9-7, pp. 44-46.  On September 30, 2009, the trial court overruled Raber's motion for acquittal.  Doc. 9-2, p. 21.  Also, on September 30, 2009, the trial court sentenced Raber to an aggregate term of 23 years to life.  Doc. 9-2, p. 21, Doc. 9-7, pp. 56-57.

**B.    Direct appeal**

On October  28, 2009, Raber, with counsel, filed a notice of appeal with the Ninth District Court of Appeals.  Doc. 9-7, p. 60.  In her appellate brief, Raber through counsel raised the following assignments of error:

1.  The trial court erred to the prejudice of Barbara Raber by overruling her motion to suppress evidence.

2.  The trial court erred, or committed plain error, to the prejudice of Barbara Raber, by admitting testimony about text messages or electronic communications allegedly exchanged between Eli Weaver and Barbara Raber, by admitting the text messages or electronic communications as exhibits, and by not affirmatively demonstrating compliance with the requirements for the admission of such evidence contained in Ohio Revised Code 2933.51 *et seq.*.

3.  The trial court committed plain error by admitting evidence of digitally stored information and other electronic communications taken from computers.

4.  The conviction was against the manifest weight of the evidence.

Doc. 9-7, pp. 68, 81-112.  On February 8, 2010, the State filed its brief.  Doc. 9-7, pp. 115-148.  On February 23, 2010, Raber through counsel filed her Reply brief.  Doc. 9-8, pp. 1-12.  On March 31, 2010, Raber, acting *pro se*, filed a request to appoint a new appeal attorney.  Doc. 9-7, p. 59.  On May 3, 2010, Raber's motion to appoint new counsel for appeal was stricken.  Doc. 9-7, p. 59.

On May 18, 2010, Raber through counsel filed a "Stipulation Limiting Issue on Error No. 2" wherein Raber stipulated that "the issue in Error No. 2 should be limited to the compliance with statutory law regarding intercepted communications, pursuant to R.C. 2933.51 *et seq*, and should not involve Dep. Mullet's translations of communications between Babara Raber and her husband on the grounds of Evid. R. 604 and 702."  Doc. 9-8, pp. 13-14.  In the stipulation, it was indicated that "Counsel is not concerned with the communications between Ms. Raber and her husband, but only with the text messages between Barbara Raber and Eli Weaver, and with the related computer-stored internet searches."  Doc. 9-8, p. 13.  On June 17, 2010, the State of Ohio filed a "Notice of Supplemental Authority" setting forth the case of *Berghuis v. Thompkins*, decided by the U.S. Supreme Court on June 1, 2010.  Doc. 9-8, pp, 15-43.

On August 30, 2010, the Ninth District Court of Appeals affirmed Raber's conviction. Doc. 9-8, pp. 44-71.  Respondent states that Raber did not appeal that decision.[4]  Doc. 9, pp. 8-9.

**C.**     ***Pro se* petition for post-conviction relief**

On December 14, 2009, Raber, acting *pro se*, filed a petition for post-conviction relief in the trial court.  Doc. 9-8, pp. 72-76.  In her "Petition to Vacate or Set Aside Judgment of Conviction or Sentence" Raber asserted one claim stating, "was charged for murder that I did not commit."  Doc. 9-8, p. 73.  In support of her claim, she stated, "There wasn't any kind of evidence that put me there at the time of the crime."  Doc. 9-8, p. 73.  On January 5, 2010, the State of Ohio filed a Response to Raber's Petition to Vacate.  Doc. 9-8, pp. 77-78.  It does not appear from the record that a decision has been rendered on Raber's Petition to Vacate.

---

[4] Raber states in her Petition that she did seek review in the Ohio Supreme Court but provides no case number (Doc. 1, pp. 2-3) and does no refute Respondent's statement in her Traverse.  In any event, the issues here relate to Raber's App. R. 26(B) Application for Reopening.

**D.      Application for reopening pursuant to Ohio App. R. 26(B)**

On February 9, 2012, Raber, acting *pro se*, filed an Application for Reopening Appeal

pursuant to Ohio App.R. 26(B).  Doc. 9-8, pp. 79-91.   In her Motion, Raber set forth the

following assignments of error that she alleged her appellate counsel was ineffective for not

arguing:

1.  Sentence contrary to law.[5]

2.  Trial counsel was ineffective in the assistance of defendant.[6]

3.  Due process violated when state submitted text messages without the testimony from an expert whom authenticated the text, and/or submitted partial text which violated due process and led to an unsupportable story which led to a conviction in violation of the states burden to prove guilt beyond a reasonable doubt.

4.  Due process was violated when Raber was wrongfully indicted which led to an improper conviction.

5.  Trial court abused their discretion by wrongfully sentencing defendant to PRC which has been deemed in violation of mandate law.

Doc. 9-8, pp. 83-89.  On February 23, 2012, the State of Ohio filed its Objection to Appellant's

Motion to Re-Open.  Doc. 9-8, pp. 92-94.  On March 6, 2012, the Ninth District Court of

Appeals found that Raber's application had been filed more than ninety days past the

journalization of the Ninth District Court of Appeals' August 30, 2010, judgment and Raber had

not provided the court with any explanation for the delay.  Doc. 9-8, p. 95.  Accordingly, the

Ninth District Court of Appeals found that good cause for the late filing did not exist and denied

the application as untimely.  Doc. 9-8, p. 95.

---

[5] In her first assignment of error, Raber presented four arguments as to how her sentence was contrary to law.  Doc. 9-9, pp. 83-84.

[6] In her second assignment of error, Raber presented ten arguments as to how trial counsel was ineffective.  Doc. 9-8, pp. 84-87.

On April 16, 2012, Raber, acting *pro se*, filed a notice of appeal in the Ohio Supreme Court from the Ninth District Court of Appeals' March 6, 2012, judgment denying her application (Doc. 9-8, pp. 98-99) along with a Memorandum in Support of Jurisdiction (Doc. 9-8, pp. 100-103).  In her Memorandum in Support of Jurisdiction, Raber raised the following two propositions of law:

> Proposition of Law No. One:  Ineffective assistance of counsel.  Due to counsel failing to raise the claims that I demandedly sought to raise which would have had the tendency to change the outcome.
>
> Proposition of Law No. Two: Denied right to appeal.  Due to appeal counsel failing to raise claims I demandedly sought and by the appeal court denying 26(b) after the rule of appeal court was satisfied.

Doc. 9-8, p. 102.  On June 20, 2012, the Ohio Supreme Court dismissed Raber's appeal as not involving any substantial constitutional question.  Doc. 9-8, p. 104.

**E.      Federal Habeas Corpus**

In her Petition, filed on April 10, 2012, Raber asserts the following two grounds for relief:

> **Ground One:** Denied right to appeal.
>
> **Supporting Facts:** 1. Appeal counsel was ineffective by denying me my right to appeal by failing to raise reversible errors.  2. Appeal right and due process denied when counsel failed to raise claims I sought.  3. Appeal right denied by counsel failing to raise ineffective trial counsel.  4. Appeal court denying 26(B) denied me right to appeal.
>
> **Ground Two:** Denied effective asst. of counsel on appeal.
>
> **Supporting facts:**  1. Counsel failed to honor my claim wishes to raise.  2. Counsel failed to raise trial counsels ineffectiveness and abuse which was recorded on record.  3.  Counsel on appeal failed to raise plain-to-see reversible error.  4.  Counsel failed to assist appellant with timely 26(B) after all his much felt claims were denied as meritless.

Doc. 1, pp. 5, 7.

Pursuant to leave of court to provide specific factual allegations in support of her claim of ineffective assistance of appellate counsel which was based in part on appellate counsel's failure to raise ineffective assistance of trial counsel claims, Raber, on January 18, 2013, filed a Supplemental Amendment setting forth the following additional supporting facts:

[BECAUSE], 1- Sentence violates Due process and Cruel and unusual punishment because: (a) I was indicted for Agg. Murder, however sentenced (pursuant to entry) to "Murder" of a differ statute, . . . (b) and I was sentenced with a fire arm which is contrar to law when no fire arm was submitted, however the state tried to justify it by submitting several possible weapons for the crime, . . . (c) my sentence is contrar to law because I am innocent of ALL charges and I did not, with effective investigation, commit this horrible act, . . . (d) My sentence is contrar to law because counsel failed to act professionally, which evidence and jail officials witnessed trial counsel treating me as if he was an abusive ex-boyfriend rather than counsel, . . . (e) The sentenced, had I been guilty of such a crime exceeds the sentence permitted for such offense, (f) The Consecutive sentences is too contrar to law . . .

In furtherance, Counsel(s) was ineffective because they refused to raise my claim of innocence, . . . and failed to investigate my alibi, evidence, . . . and failed to object to states leading evidence to convict was partial and createfully used to adhere to the story the state told, not the truth with the "full" text messages, (which the state said they did not have), which would of shown the truth, not fabricated fairy tale.

Counsel failed to raise and submit as appealable argument that the state had failed to submit any credible evidence at all to support that other than Eli (The one who commited the murder) that I was at the scene, or had the gun from (Elis gun store) nor was at the victims house at all . . . , and Counsel failed to cross-witness the inmate whom testified that I supposedly asked about how to wash a gun . . . which doesn't make any sense why I would ask how to wash a gun that the police already had and while I was in jail, wouldn't do much good now had I asked such a thing . . . and the inmate got love on her case, and Trial counsel failed to argue the sufficiency of the miranda rights, which I sought counsel on several occasions which had been ignored, and also counsel at trial and again on appeal failed to raise that my jury rights were violated because (11) Eleven of the 12 jurors were female and married all whom which only obviously focused on the state repeatedly yelling I killed a wife and mother of two children for sex . . . and in final, both trial and appeal counsel failed to raise nor object to the state repeatedly telling the jury that "Raber admitted to killing her" I never said such a thing, nor did I do it, that's why I was at jury trial, you do not go to jury trial if you admit to the crime, but counsels failed to object nor submit this in appeal.

11

For all these or one or more of these facts should show that Trial and/or Appeal counsel was ineffective, denied me due process and effective appeal and trial rights.

Doc. 6, pp. 1-2.

### III.    Law and Analysis

**A.    Standard of Review under AEDPA**

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 ("AEDPA"), apply to petitions filed after the effective date of the AEDPA.[7] *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  In particular, the controlling AEDPA provision states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A decision is "contrary to" clearly established federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)).  A state court's adjudication only results in an "unreasonable application" of clearly established federal law when the state court identifies the correct governing legal

---

[7] The AEDPA statute of limitations for filing a petition for a writ of habeas corpus is one year and it begins to run on the date judgment became final. 28 U.S.C. § 2244(d)(1).  Respondent does not contend that Raber's Petition is barred by the statute of limitations.

principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at 599-600 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The state court's application of clearly established law must be objectively unreasonable." *Id.*

In order to obtain federal habeas corpus relief, a petitioner must establish that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, 132 S. Ct. 26, 27 (2011) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011). This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 131 S. Ct. at 786 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)). In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The petitioner carries the burden of proof. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

## B.    Exhaustion and Procedural Default

### 1.    Exhaustion

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A). A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6

(1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)) ("[f]ederal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts").  A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

### 2.  Procedural Default

A petitioner must meet certain procedural requirements in order to have his claims reviewed in federal court.  *Smith v. Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 430 (6th Cir. 2006).  "Procedural barriers, such as . . . rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim."  *Daniels v. United States*, 532 U.S. 374, 381 (2001).  Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Failure to exhaust applies where state remedies are "still available at the time of the federal petition."  *Id.* at 806 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).  In contrast, where state court remedies are no longer available, procedural default rather than exhaustion applies.  *Williams*, 460 F.3d at 806.

Procedural default may occur in two ways.  *Williams*, 460 F.3d at 806.  First, a petitioner procedurally defaults a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court."  *Id.*  In *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986), the Sixth Circuit provided four prongs of analysis to be used when determining whether a claim is barred on habeas corpus review due to a petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim and whether

14

petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *See also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)); *see also Baston v. Bagley*, 282 F.Supp.2d 655, 661 (N.D.Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."); *see also State v. Moreland*, 50 Ohio St.3d 58, 62 (1990)(failure to present a claim to a state court of appeals constituted a waiver). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806. While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, see *Coleman v. Thompson,* 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review. *Williams,* 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered. *Coleman*, 501 U.S. at 750.

"'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id.* at 753.  "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.*  "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

**C.      Grounds One and Two are procedurally defaulted**

Although presented as two separate grounds for relief, Grounds One and Two both seek habeas corpus relief based on alleged ineffective assistance of appellate counsel.  Doc. 1, pp. 5, 7.  As support for her grounds for relief claiming ineffective assistance of appellate counsel, pursuant to leave of court, Raber amended her Petition to provide specific factual allegations in support of her claim of ineffective assistance of appellate counsel, which was based in part on appellate counsel's failure to raise ineffective assistance of trial counsel claims.  Doc. 4, Doc. 6.

Respondent contends that Raber has procedurally defaulted her habeas grounds for relief.[8]  In response, Raber claims that she preserved her federal habeas claims, i.e., ineffective assistance of appellate counsel, by virtue of the fact that she filed an Application for Reopening pursuant to Ohio App. R. 26(B).  Doc. 10, p. 2.  However, contrary to the requirements of App. R. 26(B),[9] Raber filed her Application for Reopening on February 9, 2012, (Doc. 9-8, p. 79),

---

[8] To the extent that Respondent has argued that Raber procedurally defaulted claims of ineffective assistance of trial counsel, an argument that Raber has not responded to, Respondent's argument is superfluous because Raber has not asserted stand alone ineffective assistance of trial counsel claims.  Rather, as Raber states in her Traverse, "the Grounds for Habeas relief stem from my Direct Appeal and Appellate Counsel."   Doc. 10, p. 2.  Thus, Raber's factual allegations as to alleged errors by her trial counsel were submitted in support of her contention that her appellate counsel was ineffective by failing to raise her trial counsel's alleged ineffectiveness.

[9] App. R. 26(B) requires that a defendant in a criminal case file an application for reopening "within ninety days from journalization of the appellate judgment unless the applicant shows good cause for the filing at a later time."

more than ninety days beyond the journalization of the Ohio Court of Appeals' August 30, 2010, judgment. (Doc. 9-8, p. 44). On March 6, 2012, the Ohio Court of Appeals denied Raber's App. R. 26(B) Application as untimely, stating:

> Appellant has moved this Court to reopen her appeal. Pursuant to App.R. 26(B)(1) an application for reopening must be filed within ninety days from the journalization of the appellate judgment unless the application shows good cause for filing at a later time. . . This appeal was decided on August 30, 2010. The application for reopening was filed on February 9, 2012, more than ninety days past the journalization of this Court's judgment. Appellant has not provided this Court with any explanation for the delay in the filing of her application. According[ly], this Court finds that good cause for the late filing does not exist. The application is denied as untimely.

Doc. 9-8, p. 95.

Where the issue involves a petitioner's failure to observe a state procedural rule, analysis under *Maupin* is warranted to determine whether the claim is barred on federal habeas review. *See Maupin*, 785 F.2d at 138. In analyzing Raber's presentation of her alleged ineffective assistance of appellate counsel claims to the state courts for review under *Maupin*, the foregoing demonstrates that, under the first two *Maupin* prongs, Raber failed to comply with a state procedural rule and the state court enforced that rule. With respect to the third *Maupin* prong, i.e., whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim, the Sixth Circuit has held that App. R. 26(B) constitutes an adequate and independent state procedural rule in non-capital cases. *See Parker v. Bagley*, 543 F.3d 859, 862 (6th Cir. 2008); *Scuba v. Brigano*, 527 F.3d 479, 488 (6th Cir. 2007).

Based on the foregoing, the undersigned concludes that, under the first three *Maupin* prongs, Ohio App. R. 26(B) is a state procedural rule applicable to petitioner's claim of ineffective assistance of appellate counsel and petitioner failed to comply with that rule; the state

court enforced Ohio App. R. 26(B); and Ohio App. R. 26(B) is an adequate and independent state ground on which the state can foreclose review of his federal constitutional claims. Thus, Raber must demonstrate cause and prejudice to excuse her procedural default of the ineffective assistance of appellate counsel claims.[10]

With respect to Ground Two, Raber asserts "Counsel failed to assist appellant with timely 26(B) after all his much felt claims were denied as meritless." Doc. 1, p. 7, *see also* Doc. 10, p. 4. Although Raber did not clearly assert that the foregoing is her "cause" to excuse her procedural default, to the extent that Raber has attempted to assert that ineffective assistance of appellate counsel constitutes cause for the untimely filing of her App. R. 26(B), as discussed below, that claim is without merit because Raber had no right to counsel in the preparation of an App. R. 26(B) application and therefore may not rely on alleged ineffectiveness of appellate counsel as cause for her untimely App. R. 26(B) Application.

"Cause for procedural default exists where something *external* to the petitioner, something that cannot fairly be attributed to him, . . . impeded his efforts to comply with the State's procedural rule." *Maples v. Thomas*, 132 S.Ct. 912, 922 (2012) (emphasis in original) (citations and internal quotations omitted). "Attorney error that constitutes ineffective assistance of counsel is cause." *Coleman v. Thompson*, 501 U.S. 722, 754 (1991). However, where there is no constitutional right to counsel, a petitioner cannot claim constitutionally ineffective assistance of counsel. *Coleman v. Thompson*, 501 U.S. at 752. Generally, "[t]here is no constitutional

---

[10] A petitioner may also attempt to overcome his procedural default through a showing of a fundamental miscarriage of justice, i.e., that he is actually innocent. A claim of actual innocence requires a showing of "new reliable evidence" and requires a showing of factual innocence, not mere legal insufficiency. *See Schulp v. Delo*, 513 U.S. 298, 324 (1995); *Carter v. Mitchell*, 443 F.3d 517, 538 (6th Cir. 2006) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998) for the proposition that "actual innocence means factual innocence, not mere legal insufficiency") (internal quotations omitted).

right to an attorney in state post-conviction proceedings."[11]   *Id.* (internal citations omitted).

Raber relies upon *White v. Shotten*, 201 F.3d 743 (6th Cir. 2000) for her contention that her

appellate counsel's failure to help her with a timely and effective App. R. 26(B) application was

a violation of her constitutional right to effective assistance of appellate counsel.  Doc. 10, p. 4.

Her reliance upon *White* is misplaced because the Sixth Circuit overruled *White* in *Lopez v.

Wilson* concluding that "Rule 26(B) creates a collateral post-conviction procedure, and is not part

of the direct appeal of right."  426 F.3d 339, 342 (6th Cir. 2005)(en banc).  In reliance upon

*Lopez*, the Sixth Circuit later concluded that, because App. R. 26(B) creates a collateral post-

conviction procedure and is not part of the direct right of appeal, the petitioner's appellate

counsel's failure to advise him of the ninety day deadline for filing an App. R. 26(B) application

was not cause to excuse a procedural default.  *See Wilson v. Hurley*, 382 Fed. Appx. 471, 478-

479 (6th Cir. 2010) (unpublished).  Also, in *Tolliver*, the Sixth Circuit concluded that, "[u]nder

Ohio law . . . a Rule 26(B) proceeding is a 'separate collateral' proceeding rather than part of the

original appeal." *Tolliver v. Sheets*, 594 F.3d 900, 929 (6th Cir. 2010).  Thus, the petitioner had

"no constitutional right to counsel for the proceeding—and thus certainly had no constitutional

right to *effective* counsel . . . [and] any poor advice he received from an attorney cannot establish

cause for his default." *Id.* (emphasis in original) (internal citations omitted); *but see Gunner v.

Welch*, 749 F.3d 511, 515 (6th Cir. 2014) (reversing district court's denial of federal habeas

relief where the lower court relied upon *Wilson* when analyzing whether appellate counsel's

---

[11] In *Martinez v. Ryan*, — U.S. —, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), the Supreme Court qualified *Coleman* by recognizing a narrow exception: "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S.Ct. at 1315 (the initial-review proceeding was the first designated proceeding in Arizona in which the petitioner could raise a claim of ineffective assistance of trial counsel); *see also  Trevino v. Thaler*, —  U.S. —, 133 S.Ct. 1911, 1921, 185 Led.2d 1044 (2013) (applying *Martinez* where "the state procedural framework, by reason of its design and operations, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal.").

failure to advise his client of the triggering date for filing a post-conviction proceeding under Ohio Rev. Code § 2953.21 could constitute cause to excuse petitioner's procedural default of the only viable issue, an ineffective assistance of trial counsel claim).[12]

Here, Raber has failed to demonstrate that the App. R. 26(B) procedure constitutes part of her direct appeal such that she would be entitled to counsel to pursue that procedure.[13]  In addition to her failure to show that she was entitled to counsel with respect to the filing of an App. R. 26(B) application,  Raber has not demonstrated that her appellate counsel's conduct prevented her from timely filing an App. R. 26(B) application nor has she attempted to demonstrate how her appellate counsel's performance with respect to the filing of her App. R. 26(B) application constituted ineffective assistance of counsel under the standard enunciated in *Strickland v. Washington*, 464 U.S. 810 (1983).[14]

Accordingly, for the reasons discussed herein, the undersigned concludes that Raber has failed to demonstrate cause and prejudice to excuse her procedural default of her federal habeas grounds for relief and has not demonstrated that her procedural default should be overcome on the basis that she is actually innocent.

---

[12] This case is distinguishable from *Gunner*.  In *Gunner*, the petitioner alleged that his failure to timely file a post-conviction proceeding pursuant to Ohio Rev. Code § 2953.21 was the result of his appellate counsel failing to advise him of the time limit for filing the post-conviction petition.  *Gunner*, 749 F.3d at 515.  Here, Raber alleges that counsel failed to assist her with her 26(B) filing.  She does not argue that her appellate counsel did not advise her of the Ohio Court of Appeals' August 30, 2010, decision affirming her conviction.  Nor does Raber allege that she was unaware of the time period in which she was required to file an App. R. 26(B) application.

[13] The narrow holdings in *Martinez* and *Trevino* do not alter the undersigned's analysis.  For example, in *Martinez* , the Supreme Court explicitly stated that its holding did "not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in State's appellate courts."  132 S.Ct. at 1320.

[14] To establish that her attorney was constitutionally ineffective, a petitioner must demonstrate that (1) the attorney made such serious errors he was not functioning as "counsel" guaranteed by the Sixth Amendment; and  (2) counsel's allegedly deficient performance prejudiced the defense.  *Strickland*, 466 U.S. 668, 687 (1984).  The right to effective assistance of counsel extends to the first appeal as of right, *Evitts v. Lucey*, 469 U.S. 387 (1984), and *Strickland* is applied to claims of ineffective assistance of counsel, including those relating to appellate counsel. *Smith v. Murray*, 477 U.S. 527, 535-536 (1986).

Accordingly, the undersigned concludes that Raber has procedurally defaulted her federal habeas grounds for relief.

### IV.     Conclusion and Recommendation

For the reasons stated herein, the undersigned recommends that Raber's Petition for writ of habeas corpus be **DENIED**.  Petitioner's request for an evidentiary hearing contained in her Traverse (Doc. 10) is **DENIED** as moot.


Dated: November 4, 2014

_Kathleen B. Burke_
Kathleen B. Burke
United States Magistrate Judge


### <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).